UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

G.A.P., an infant by his parents and natural
guardians CATERINA PUNGELLO and
JOSEPH PUNGELLO, and CATERINA
PUNGELLO and JOSEPH PUNGELLO,
individually,

　　　　　　　　　　　　　Plaintiffs,

　　　　v.

THE UNITED STATES OF AMERICA,

　　　　　　　　　　　　　Defendant.

No. 24-CV-0152 (KMK)

OPINION & ORDER

Appearances:

Derek S. Sells, Esq.
The Cochran Firm
New York, NY

Michael Adam Fischbein, Esq.
Paul B. Weitz & Associates
New York, NY
*Counsel for Plaintiffs*

Alexander Kristofcak, Esq.
Mark Osmond, Esq.
United States Attorney's Office for the
Southern District of New York
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

　　　G.A.P., an infant by his parents and natural guardians Caterina Pungello and Joseph

Pungello, and Caterina Pungello and Joseph Pungello, individually (collectively "Plaintiffs"),

bring this Action against the United States of America ("Defendant" or the "Government"),

pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401, 2671–80.

Plaintiffs assert claims for medical malpractice in connection with G.A.P.'s delivery.  (*See* Dkt.

No. 2 ¶¶ 23–24, 32–33, 39–41, 46, 50 (the "Complaint" or "Compl.").)[1]  Before the Court is the

Government's Motion for Summary Judgment on Plaintiffs' claims (the "Motion").  (*See* Gov't

Not. of Mot. (Dkt. No. 20).)  For the reasons explained below, the Government's Motion is

granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule

56.1.  (*See* Gov't Rule 56.1 Statement ("Gov't 56.1") (Dkt. No. 22); Pls' Response Rule 56.1

Statement ("Pls' Resp. 56.1") (Dkt. No. 25).)[2]  Additionally, where necessary, the Court cites

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

[2] Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [its] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant[]' asserted facts without specifically controverting those same facts. . . .  [A] number of [the] [p]laintiff['s] purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[]."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

directly to the admissible evidence submitted by the Parties. The facts as described below are undisputed unless otherwise noted.

Plaintiff Caterina Pungello ("Ms. Pungello") was a prenatal patient at Crystal Run Health Care in 2018, while she was pregnant with her second child, and again in 2020, while she was pregnant with G.A.P.[3] On the morning of June 2, 2020, Ms. Pungello and her husband, Plaintiff Joseph Pungello ("Mr. Pungello"), went to Montefiore St. Luke's Cornwall Hospital in Newburgh, New York (the "Hospital"), because Ms. Pungello was experiencing contractions. (Gov't 56.1 ¶ 1; Pls' Resp. 56.1 ¶ 1.) Dr. Fatima Flood, an employee of Crystal Run Health Care, was the attending physician on call at the Hospital when the Pungellos arrived on June 2, 2020. (Gov't 56.1 ¶¶ 2, 5; Pls' Resp. 56.1 ¶¶ 2, 5.)[4] Mr. Pungello remained in the Hospital with Ms. Pungello the entire duration of her stay and stood at the foot of the bed by his wife's legs during the delivery. (Fischbein Decl. Ex. 4 at 55:15–22 ("Mar. 2022 Dep. of J. Pungello") (Dkt. No. 24-4); Gov't 56.1 ¶ 7; Pls' Resp. 56.1 ¶ 7.)[5]

After Ms. Pungello labored for multiple hours, she began experiencing complications. (Gov't 56.1 ¶ 6; Pls' Resp. 56.1 ¶ 6; Mar. 2022 Dep. of C. Pungello at 73:10–18.) Specifically, near the end of Ms. Pungello's labor, Dr. Flood had difficulty delivering G.A.P. because one of his shoulders was impacted, even after Dr. Flood attempted various maneuvers to dislodge the

---

[3] Ms. Pungello received prenatal care at a different facility—Westage Business Center, in Fishkill, New York—for her first pregnancy in 2014. (Fischbein Decl. Ex. 1 at 12:25–13:16 ("Mar. 2022 Dep. of C. Pungello") (Dkt. No. 24-1).)

[4] Dr. Flood delivered Ms. Pungello's second child in 2018 and had seen Ms. Pungello for her final sonogram during her pregnancy with G.A.P. (Gov't 56.1 ¶¶ 3–4; Pls' Resp. 56.1 ¶¶ 3–4.)

[5] Throughout this Opinion, the Court cites to the full deposition transcripts submitted by Plaintiffs rather than the excerpts submitted by the Government.

shoulder.  (Gov't 56.1 ¶ 8; Pls' Resp. 56.1 ¶ 8; Fischbein Decl. Ex. 3 at 109:3–13 ("July 2022

Dep. of F. Flood") (Dkt. No. 24-3);[6] Fischbein Decl. Ex. 6 at 33:7–15 ("June 2024 Dep. of G.

Babalola") (Dkt. No. 24-6).)  Eventually, Dr. Flood called for assistance.  (Gov't 56.1 ¶ 9; Pls'

Resp. 56.1 ¶ 9.)  Dr. Gbolagade Babalola—who was employed by Cornerstone Family

Healthcare, a federally qualified health center, and had privileges at the Hospital—was on call in

the Hospital's labor and delivery department on the day in question and responded to Dr. Flood's

call for assistance.  (Gov't 56.1 ¶¶ 10–11; Pls' Resp. 56.1 ¶¶ 10–11.)  The Parties dispute

whether Dr. Flood specifically called for Dr. Babalola by name or whether she just called for

assistance generally.  (*Compare* Gov't 56.1 ¶ 9, *and* July 2022 Dep. of F. Flood at 108:12–16 ("I

said I need help, call Dr. Babalola"), *with* Pls' Resp. 56.1 ¶ 9, *and* Mar. 2022 Dep. of C.

Pungello at 76:14–19 (stating "I don't know who it was" that came in to assist Dr. Flood), *and*

Mar. 2022 Dep. of J. Pungello at 70:22–71:5 (stating he had no "understanding that someone else

was coming in to assist" and "d[id] not know that individual's name").)

The Parties also dispute whether Dr. Babalola introduced himself when he entered the

delivery room and whether the Pungellos were aware that he was a doctor.  (*Compare* Gov't 56.1

¶ 12, *and* June 2024 Dep. of G. Babalola at 39:16–25 (describing his standard policy of

introducing himself and "pull[ing] [his] badge out" to show to patients), *with* Pls' Resp. 56.1

¶ 12, *and* Mar. 2022 Dep. of C. Pungello at 76:14–19 ("I don't know who it was"), *and*

Fischbein Decl. Ex. 2 at 15:2–5 ("May 2024 Dep. of C. Pungello") (Dkt. No. 24-2) ("I didn't

know at the time [that he] was a doctor."), *and* Mar. 2022 Dep. of J. Pungello at 70:22–71:5,

---

[6] The deposition cover sheet mistakenly lists the date of Dr. Flood's deposition as July 6, 2021.  (*See* July 2022 Dep. of F. Flood at 1.)  However, the errata sheet lists the date of deposition as July 6, 2022, (*id.* at 130), and the notary public certification is dated July 14, 2022, (*id.* at 129).  The Parties do not dispute that the deposition took place in 2022.  (*See* Gov't Mem. 12; Pls' Opp'n 16.)

155:15–17 (stating he did not know Dr. Babalola's name and "never learn[ed] [his] identity").

Dr. Babalola testified that he did not "recall this [introduction] specifically." (June 2024 Dep. of

G. Babalola at 39:16–25.) Mr. Pungello later described Dr. Babalola as a "black, slim man with

glasses [wearing a] button down shirt and slacks" who was of similar height to Dr. Flood. (Mar.

2022 Dep. of J. Pungello at 71:13–15; Gov't 56.1 ¶ 13; Pls' Resp. 56.1 ¶ 13.) Given how

"chaotic" the delivery was "at that point," Ms. Pungello was unable to describe who had assisted

Dr. Flood during delivery, apart from the fact that they were male. (May 2024 Dep. of C.

Pungello at 15:6–20; Mar. 2022 Dep. of C. Pungello at 84:22–85:12.)

After entering the room, Dr. Babalola took Dr. Flood's spot on the delivery stool and

began to assist in the delivery while Ms. and Mr. Pungello observed. (Gov't 56.1 ¶¶ 14–15; Pls'

Resp. 56.1 ¶¶ 14–15.)[7] Mr. Pungello later testified that he saw Drs. Babalola and Flood "really

pulling on [G.A.P.'s] head hard," prompting Mr. Pungello to yell "Oh, come on." (Mar. 2022

Dep. of J. Pungello at 79:18–21, 78:19–20; May 2024 Dep. of J. Pungello at 11:18–12:3,

12:8–18; *see also* Mar. 2022 Dep. of C. Pungello at 75:20–76:2, 93:19–24 (testifying her

husband yelled "oh, come on" during the delivery).) Dr. Babalola performed the "Woods Screw

maneuver" and dislodged the infant's shoulder; Ms. Pungello gave birth promptly thereafter.

(Gov't 56.1 ¶ 18; Pls' Resp. 56.1 ¶ 18.)[8]

G.A.P. was taken to the Hospital's neonatal intensive care unit ("NICU") after the birth;

Ms. and Mr. Pungello visited their child shortly later that same day. (Gov't 56.1 ¶ 19; Pls' Resp.

---

[7] Ms. Pungello was unable to see "all the way over" during the delivery but testified that she knew the doctors "were working to try to get the baby out" and that "they moved [her] legs a lot." (May 2024 Dep. of C. Pungello at 20:15–25; Gov't 56.1 ¶ 16; Pls' Resp. 56.1 ¶ 16.)

[8] The Woods Screw (or "Woods Corkscrew") is a maneuver in which the infant is rotated 180 degrees. (*See* July 2022 Dep. of F. Flood at 106:22–25; June 2024 Dep. of G. Babalola at 46:19–22.)

5

56.1 ¶ 19.)  There, another doctor informed them that G.A.P. had been diagnosed with Erb's palsy, which can occur when an infant's "head is pulled too hard during birth and it stretches the nerves, which then causes the arms to be limp."  (Mar. 2022 Dep of C. Pungello at 99:24–100:13; Mar. 2022 Dep. of J. Pungello at 89:14–90:22; Gov't 56.1 ¶ 20; Pls' Resp. 56.1 ¶ 20.)  The doctor informed the Pungellos that both of G.A.P.'s arms were limp at the time. (Mar. 2022 Dep of C. Pungello at 100:12–13; Mar. 2022 Dep. of J. Pungello at 91:9–11.)  The Pungellos further testified that the NICU doctor informed them that "sometimes [Erb's palsy] heals on its own," (Mar. 2022 Dep. of J. Pungello at 91:19–22), in "up to like six months to a year," although if it did not heal on its own, "surgery could be needed," (Mar. 2022 Dep. of C. Pungello at 100:14–19).

After the delivery, Dr. Flood prepared a delivery note describing the birth.  (July 2022 Dep. of F. Flood at 99:13–15.)  In the delivery note, Dr. Flood did not mention Dr. Babalola's assistance or presence—which she later testified was "an error on [her] part"—although she did mention in the note that a neonatologist was called after birth.  (*Id.* at 124:23–6; *see also* Fischbein Decl. Ex. 7 at 50–51 ("MSL Hospital Chart Part 1") (Dkt. No. 24-7).)  Dr. Babalola did not prepare a report after the delivery or otherwise note his involvement in the medical record.  (Gov't 56.1 ¶ 22; Pls' Resp. 56.1 ¶ 22.)  The Parties dispute whether Dr. Babalola had an obligation to record his involvement.  (*Compare* Gov't 56.1 ¶¶ 22–24, *and* June 2022 Dep. of G. Babalola at 50:10–18, 51:7–11, 52:24–53:25, 55:14–17; 59:14–19, *with* Pls' Resp. 56.1 ¶¶ 22–24.)  Ms. Pungello's 337-page medical records from her delivery and hospital stay include a "Fetal Monitoring" report authored by nurse Tami Foster, which notes: "Dr. Babalola in room assisting."  (Fischbein Decl. Ex. 7 at 5 ("MSL Hospital Chart Part 2") (Dkt. No. 24-8); Gov't 56.1 ¶ 21; Pls' Resp. 56.1 ¶ 21.)

B.  Procedural History

On May 18, 2021, the Pungellos filed a lawsuit in New York State Supreme Court, Orange County (the "State Action"), naming Dr. Flood, Crystal Run Health Care, and the Hospital as defendants (the "State Defendants").  (*See generally G.A.P. v. Fatima Flood, et al.*, EF03273-2021, Orange Cnty. Sup. Ct. (the "State Dkt."); Gov't 56.1 ¶ 25; Pls' Resp. 56.1 ¶ 25; Fischbein Decl. Ex. 8 (Dkt. No. 24-10).)  In the State Action, the Pungellos asserted claims for medical malpractice based on injuries arising from G.A.P.'s June 2, 2020 delivery.  (Gov't 56.1 ¶ 25; Pls' Resp. 56.1 ¶ 25; Fischbein Decl. Ex. 8 ¶¶ 59–72, 74–76, 81–82, 85–86.)  On August 3, 2021, the Pungellos served discovery requests on the State Defendants.  (Gov't 56.1 ¶ 26; Pls' Resp. 56.1 ¶ 26; Fischbein Decl. Ex. 9 (Dkt. No. 24-11).)  The Pungellos received no responses to those requests but did not move to compel responses.  (Gov't 56.1 ¶ 26; Pls' Resp. 56.1 ¶ 26; *see generally* State Dkt.)  The Pungellos were both deposed in connection with the State Action in March of 2022.  (*See* Mar. 2022 Dep. of C. Pungello; Mar. 2022 Dep. of J. Pungello.)  On July 6, 2022, Dr. Flood was produced for a deposition in connection with the State Action.  (*See* July 2022 Dep. of F. Flood.)  During her deposition, Dr. Flood identified Dr. Babalola as the on-call physician who assisted her with G.A.P.'s delivery.  (*Id.* at 108:5–25.)  The following month, the Pungellos filed a Notice of Issue in the State Action, indicating they believed the matter ready for trial.  (State Dkt. No. 23.)  The State Action settled on October 7, 2024, and was discontinued per joint stipulation on October 23, 2024.  (State Dkt. Nos. 60–61.)

On August 12, 2022, a little over a month after Dr. Flood identified Dr. Babalola in her deposition, (*see* July 6, 2022 Dep. of F. Flood at 108:5–25), Plaintiffs submitted administrative tort claims to the U.S. Department of Health & Human Services ("HHS"), alleging that Dr. Babalola committed medical malpractice during G.A.P.'s delivery, (Gov't 56.1 ¶ 27; Pls' Resp.

56.1 ¶ 27; Osborn Decl. Ex. J (Dkt. No. 23-10)).  The HHS denied the claims on April 20, 2023,

noting "[t]he evidence fails to establish that the alleged injuries were due to" negligence, and

further concluding the claims were "untimely under the FTCA" as they were submitted "more

than two years after the date on which they accrued."  (Osborn Decl. Ex. K at 3 (Dkt. No. 23-11);

Gov't 56.1 ¶ 28; Pls' Resp. 56.1 ¶ 28.)  Plaintiffs moved for reconsideration on May 9, 2023,

which the HHS denied nearly three months later.  (Osborn Decl. Ex. L at 2 (Dkt. No. 23-12);

Gov't 56.1 ¶ 29; Pls' Resp. 56.1 ¶ 29.)

On January 9, 2024, Plaintiffs filed their Complaint in this Court, listing the United States

of America as the sole defendant and asserting claims for medical malpractice against Dr.

Babalola in connection with G.A.P.'s delivery.  (*See* Compl. ¶¶ 23–24, 32–33, 39–41, 46, 50.)

On March 18, 2024, the Government filed a pre-motion letter seeking leave to file a Motion to

Dismiss the Complaint or, alternatively, a Motion for Summary Judgment.  (Dkt. No. 10.)

Plaintiff responded to the Government's pre-motion letter on March 22, 2024.  (Dkt. No. 11.)

After holding a pre-motion conference on April 8, 2024, the Court issued an order granting the

Parties ninety days to conduct discovery limited to the issues relevant to the Government's

putative Motion for Summary Judgment.  (Dkt. No. 13.)  The Court further set a briefing

schedule for said motion.  (*Id.*)  On June 28, 2024, the Parties jointly notified Magistrate Judge

Andrew E. Krause that discovery in this case had been completed.[9]  (*See* Letter from A.

Kristofcak, Esq. to the Hon. Andrew E. Krause (June 28, 2024) (Dkt. No. 19).)

The Government filed its Motion on August 7, 2024.  (*See* Gov't Not. of Mot.; Gov't

Mem. of Law in Supp. of Mot. ("Gov't Mem.") (Dkt. No. 21); Gov't 56.1; Decl. of Mark

---

[9]  This case previously had been referred to Judge Krause for general pre-trial
supervision.  (*See* Order of Reference (Dkt. No. 14).)

8

Osborn, Esq. in Supp. of Mot. ("Osborn Decl.") (Dkt. No. 23).)  Plaintiffs filed their Opposition

on September 6, 2024.  (*See* Decl. of Michael Fischbein, Esq. in Opp'n to Mot. ("Fischbein

Decl.") (Dkt. No. 24); Pls' Resp. 56.1; Pls' Mem. in Opp'n to Mot. ("Pls' Opp'n") (Dkt. No.

26).)  On September 20, 2024, the Government filed its Reply.  (Gov't Reply Mem. of Law in

Further Supp. of Mot. ("Reply") (Dkt. No. 27).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v.

Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source

LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov.

9, 2023) (same).  "In deciding whether to award summary judgment, the court must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in [her] favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also

Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "The movant 'bears the initial

burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v. City of

Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir.

2018)); *see also LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL

6610764, at *7 (S.D.N.Y. Oct. 10, 2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l,

Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward*, 2023 WL 6387180, at *12 (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At

this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 323–24)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *2 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)); *accord* Fed. R. Civ. P.56(c)(4); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

"As a general rule, 'district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.'"  *Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage."  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash").

However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment," *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations adopted) (internal citation omitted)).  Thus, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify

affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof." *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

    B.  Analysis

    The sole issue presented on summary judgment is whether Plaintiffs' claims are barred by the FTCA's two-year statute of limitations. Here, the Government argues that summary judgment is warranted "[b]ecause Plaintiffs filed the[ir] administrative claims more than two years after the claims accrued," and "cannot meet their burden" to demonstrate "that equitable tolling is appropriate." (Gov't Mem. 11, 14.) For the reasons discussed below, the Court agrees.

    1.  Plaintiffs' Claims Accrued On or About June 2, 2020

    The FTCA provides in relevant part that:

> [a]n action shall not be instituted upon a claim against the United States for money damages for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a). A claim under the FTCA "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." *Id.*

§ 2401(b).  "Typically, FTCA medical malpractice claims accrue at the time of injury." *A.Q.C. ex re. Castillo v. United States*, 656 F.3d 135, 139 (2d Cir. 2011) (internal quotation marks omitted).  However, "where a plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual' applies." *Id.* at 139–40 (internal quotation marks omitted).  This rule mandates that the accrual date is, when through reasonable diligence, the plaintiff "has or . . . should have discovered the critical facts of both [the] injury and its cause." *Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982); *see also A.Q.C.*, 656 F.3d at 140 (same).

The diligence-discovery rule "is not an exacting requirement." *A.Q.C.*, 656 F.3d at 140 (citing *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1988)).  A "plaintiff need not know each and every relevant fact of [the] injury or even that the injury implicated a cognizable legal claim for [the] claim to accrue." *J.D. ex rel. Doe v. United States*, No. 10-CV-4296, 2011 WL 292010, at *8 (S.D.N.Y. Jan. 28, 2011) (citing *Kronisch*, 150 F.3d at 121)).  Instead, the diligence-discovery rule "requires only knowledge of, or knowledge that could lead to, *the basic facts of the injury*, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it." *Kronisch*, 150 F.3d at 121 (emphasis added).  "[A] claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." *Id.*; *J.D. ex rel. Doe*, 2011 WL 292010, at *7 (same)).  Accordingly, "for a medical malpractice claim to accrue under the FTCA, the plaintiffs must understand 'that the injury he suffered related *in some way* to the medical treatment he received.'" *J.D. ex rel. Doe*, 2011 WL 292010, at *7 (quoting *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008)).

*A.Q.C.* is instructive for determining when obstetric medical malpractice claims accrue. In *A.Q.C.*, the plaintiff (by her mother and natural guardian) asserted a medical malpractice claim against the delivering physician pursuant to the FTCA. *See* 656 F.3d at 138. A.Q.C. was born in February 2005 with "a weakness in her left arm and left leg" and, shortly after her birth, was referred to an "early intervention counselor who monitored her ongoing care." *Id.* In December 2005, the counselor suggested that A.Q.C.'s injury might have been caused by medical malpractice and told A.Q.C.'s mother that she should consider looking into that possibility. *Id.* A.Q.C.'s mother contacted counsel in February 2006 and retained counsel in April 2006, but did not file a federal suit until April 7, 2008, after determining the delivering physician's federal status. *Id.* at 138–39. In dismissing A.Q.C.'s claim as untimely, the Second Circuit noted that "[t]he 'critical facts' of A.Q.C.'s injury were readily discernable shortly after her February 1, 2005, birth," as, by June 2005, the cause of the weakness in A.Q.C.'s arms was identified as Erb's palsy, and her mother was "well aware of that diagnosis." *Id.* at 140. Because plaintiffs thus knew "the critical facts of her daughter's injury at or near the time of her birth, any claim related to that injury accrued once Ms. Castillo had reason to suspect that A.Q.C.'s injury was iatrogenic"— i.e., potentially caused by the medical treatment she received. *Id.*

Here, Plaintiffs became aware of the critical facts of G.A.P.'s injury shortly after his birth on June 2, 2020. Mr. Pungello testified that, during the birth, he witnessed Dr. Babalola and Dr. Flood "really pull on [G.A.P.'s] head hard," which prompted Mr. Pungello to yell "Oh, come on." (Mar. 2022 Dep. of J. Pungello at 79:18–21, 78:19–20; May 2024 Dep. of J. Pungello at 11:18–12:3, 12:8–18.) Although Ms. Pungello did not see the doctors pull on G.A.P.'s head, she heard her husband yell "Oh, come on," and later that day, when she asked Mr. Pungello why he had yelled, "he said because he saw them pulling [G.A.P.'s] head out, pulling really bad on his

head."  (Mar. 2022 Dep. of C. Pungello at 75:20–76:2, 93:19–24).  Mr. Pungello further testified

that the doctors' actions—i.e., "really pulling on [G.A.P.'s] head hard"—"did not seem in any

way similar to [his] two previous children's birth."  (Mar. 2022 Dep. of J. Pungello at 79:18–21.)

      Moreover, beyond what they directly witnessed at the birth, Plaintiffs were made aware

shortly after birth that G.A.P. had sustained an injury that could be related to the treatment he

received during delivery.  That same day, the NICU doctor informed them that G.A.P.'s arms

were limp and that he had been diagnosed with Erb's palsy.  (Mar. 2022 Dep of C. Pungello at

99:24–100:13; Mar. 2022 Dep. of J. Pungello at 89:14–22; Gov't 56.1 ¶ 20; Pls' Resp. 56.1

¶ 20.)  That doctor also informed them G.A.P.'s condition could occur when a baby's "head is

pulled too hard during birth and it stretches the nerves, which then causes the arms to be limp."

(Mar. 2022 Dep of C. Pungello at 99:24–100:13; Mar. 2022 Dep. of J. Pungello at 90:11–22;

Gov't 56.1 ¶ 20; Pls' Resp. 56.1 ¶ 20.)  Although that doctor informed them the condition might

heal on its own, he also warned that, if it did not, "surgery could be needed."  (Mar. 2022 Dep. of

C. Pungello at 100:14–19.)  In other words, on the day of his birth, Plaintiffs were aware that

G.A.P. suffered an injury that could be caused by his head being pulled and that his head had, in

fact, been pulled by the doctors during delivery.  Thus, because Plaintiffs were aware of the

"critical facts" of G.A.P.'s injury "at or near the time of [his] birth" and, because they had reason

that same day to suspect that his injury was iatrogenic, their claims accrued no later than on or

about June 2, 2020.  *See A.Q.C.*, 656 F.3d at 140; *J.D. ex rel Doe*, 2011 WL 292010, at *7

(finding a medical malpractice claim accrued shortly after a child's birth because the plaintiffs

were "first put on notice . . . by his traumatic birth [and] transfer to the hospital," and were

informed of his condition "[w]hile he was in the NICU"); *Hernandez v. United States*, No. 16-

CV-2211, 2017 WL 3328243, at *8 (S.D.N.Y. Aug. 3, 2017) (finding that a medical malpractice

claim accrued, at the very latest, once plaintiffs sought legal counsel, because the facts of the child's injury "were readily discernible shortly after [his] birth," as the child underwent serious medical evaluation, the results of which were shared with the parents "in detail," and plaintiffs discussed whether the child injuries were iatrogenic in the months following his birth).

Plaintiffs do not seriously dispute that their claims were knowable as of June 2, 2020, nor that they filed with the HHS on August 12, 2022, more than two years later. (*See* Osborn Decl. Ex. J.) However, they suggest that they did not know G.A.P.'s injury was iatrogenic at the time of his birth, arguing instead that "[t]here are multiple causes of Erb's palsy, many of which are unrelated to an iatrogenic cause," and that "[i]t is only after the delivery room and infant's records . . . are obtained and then reviewed by neurological and obstetrical experts, that there [could] be a reasonably based suspicion" of medical malpractice. (*See* Pls' Opp'n 18.) To the extent Plaintiffs are contesting that their claims accrued on June 2, 2020, this argument is unavailing.

It makes no difference as to their claims' accrual whether Plaintiffs knew the *exact* cause of G.A.P.'s injuries, as a "plaintiff need not know each and every relevant fact of the injury, or even that the injury implicates a cognizable legal claim for his claim to accrue." *J.D. ex re. Doe*, 2011 WL 292010, at *8 (internal quotation marks omitted); *id.* at *8 ("A plaintiff simply may not postpone bringing an action until the full extent of that damage is ascertained." (citing *Toal v. United States*, 438 F.2d 222, 225 (2d Cir. 1971))); *Hernandez*, 2017 WL 3328243, at *10 ("Were knowledge of the actual *cause* of an injury—as indicated by medical records—required to trigger the accrual date, the statute of limitations could be tolled indefinitely, as often the cause of an injury is unknown."). Similarly, it makes no difference as to when Plaintiffs were able to review G.A.P.'s medical records. In *A.Q.C.*, the plaintiffs also argued that they "could not have

suspected that the injury was iatrogenic until [they] retained counsel, who then received and reviewed the relevant medical records." 656 F.3d at 141. The Second Circuit rejected this argument, noting that "medical malpractice claims brought under the FTCA can, and often will, accrue *before* a plaintiff actually retains counsel and before counsel requests, let alone receives, the relevant medical records." *Id.*

So too here. Plaintiffs' claims did not somehow await accrual until the moment they obtained and reviewed G.A.P.'s medical records. Instead, they began to accrue when Plaintiffs "had reason to suspect that the injury [G.A.P.] suffered related in some way to the medical treatment [he] received." *Id.* at 142 (citing *Kronisch*, 150 F.3d at 121). Plainly, by their own testimony, Plaintiffs had ample reason to suspect that G.A.P.'s injuries were related to the medical treatment from the day of his birth. (Mar. 2022 Dep. of J. Pungello at 79:18–21, 89:14–90:22; Mar. 2022 Dep of C. Pungello at 99:24–100:13.) Plaintiffs thus did not need to wait to review the relevant medical records or determine the precise cause of G.A.P.'s injury to have "reason to suspect" that it was potentially caused by medical malpractice. *A.Q.C.*, 656 F.3d at 142; *see Valdez*, 518 F3d at 178 (the statute of limitations begins to run "when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered" that the injury might be related to medical malpractice); *J.D. ex rel. Doe*, 2011 WL 292010, at *8 (same).

Accordingly, the Court concludes that, as a matter of law, Plaintiffs' claims accrued no later than on or about June 2, 2020.

2.  <u>Plaintiffs' Claims Are Not Equitably Tolled</u>

Because Plaintiffs did not file their administrative complaint until August 12, 2022—more than two years after their claim accrued—their claims are timely only if the statute of limitations was tolled.

"[T]ime limitations under the FTCA are nonjurisdictional and therefore subject to equitable tolling." *Palmer-Williams v. United States*, No. 14-CV-9260, 2016 WL 676465, at *3 (S.D.N.Y. Feb. 18, 2016) (citing *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015)). Equitable tolling is "a drastic remedy applicable only in 'rare and exceptional circumstances.'" *A.Q.C.*, 656 F.3d at 144 (alteration omitted) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). In addition, there must be a causal connection between the extraordinary circumstances and a party's failure to timely file his action. *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011) ("To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances. He must further demonstrate that those circumstances caused him to miss the original filing deadline."); *Quinn v. United States*, No. 20-CV-3261, 2021 WL 738756, at *9 (S.D.N.Y. Feb. 25, 2021) (noting, to establish equitable tolling, "there must be a causal connection between the extraordinary circumstances and a party's failure to timely file his action" (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010))).

Plaintiffs argue that their claims should be equitably tolled because: (1) they diligently pursued their rights, as evidenced by the record in the State Action, (Pls' Opp'n 18–20); and (2) Dr. Babalola's "[i]ntentional [c]oncealment"—that is, his "commit[ting] professional misconduct

to conceal the true extent of his involvement in the infant plaintiff's delivery"—is an extraordinary circumstance warranting equitable tolling, (*id.* at 20–23). The Court addresses both arguments in turn.

a.   <u>Diligent Pursuit</u>

Plaintiffs point to their litigation of the State Action as an example of their diligence in pursuing their rights. (Pls' Opp'n 18–19.) However, while the State Docket indicates that Plaintiffs did consistently pursue that case against the State Defendants, (*see generally* State Dkt.), Plaintiffs cannot demonstrate that they diligently pursued their rights as to their claims against *Dr. Babalola*, the single federal employee in this Action.[10]

To the contrary, the record indicates that Plaintiffs—and their attorneys—made no effort to identify Dr. Babalola before Dr. Flood named him during her deposition. Although Plaintiffs claim that they were "diligent in obtaining Dr. Flood's testimony," particularly during a "world-wide pandemic," (Pls' Opp'n 15–16),[11] this argument erroneously presumes that Dr. Flood's

---

[10] The Government asserts that "in the two years after the birth, counsel did nothing but serve written discovery requests in the state action against Dr. Flood and the Hospital, and took no action when those requests were ignored." (Reply 14.) This is incorrect. Plaintiffs concede that they took no action when the State Defendants failed to respond to their discovery requests. (Pls' Resp. 56.1 ¶ 26.) However, a review of the State Docket makes clear that, those discovery requests aside, Plaintiffs continued to pursue the State Action until it settled this year. (*See generally* State Dkt.) Moreover, just as Plaintiffs cannot rely on their litigation of the State Action to demonstrate diligence in pursuing their federal claims, the Government cannot rely on Plaintiffs' alleged failure to pursue discovery in the State Action as dispositively proving they lacked diligence.

[11] Plaintiffs' suggestion that the COVID-19 pandemic affected their ability to pursue their claims lacks any supporting explanation. (*See* Pls' Opp'n 11, 15, 18.) It is well established in the Second Circuit that "the fact of the pandemic alone generally cannot justify equitable tolling." *Jamieson v. United States Postal Serv.,* No. 20-CV-6184, 2022 WL 43767, at *3 (E.D.N.Y. Jan. 5, 2022); *Pryce v. United States,* No. 21-CV-1698, 2022 WL 3155842, at *8 (S.D.N.Y. Aug. 8, 2022) (same); *Carlaftas v. Bevapor Trucking Servs. LLC*, No. 21-CV-10253, 2023 WL 251940, at *2 (S.D.N.Y. Jan. 18, 2023) (same). Accordingly, the Court will not consider the pandemic as part of the equitable tolling analysis.

testimony was the only method of ascertaining Dr. Babalola's identity.  As the Government

points out, this claim is directly contradicted by Plaintiffs' own testimony.  (Gov't Mem. 12.)

Although the record suggests that Mr. and Ms. Pungello were unaware of Dr. Babalola's name

when he began assisting Dr. Flood,[12] that does not mean they were unaware of his involvement.

To the contrary, Mr. and Ms. Pungello both testified that they knew some individual assisted Dr.

Flood during the birth.  (Mar. 2022 Dep. of C. Pungello at 76:14–19; Mar. 2022 Dep. of J.

Pungello at 70:22–71:5.)  Although Ms. Pungello understandably could not describe that

individual's appearance, due to the traumatic and chaotic experience of labor, (May 2024 Dep. of

C. Pungello at 15:6–20; Mar. 2022 Dep. of C. Pungello at 84:22–85:12), Mr. Pungello was able

to describe Dr. Babalola's physical appearance and clothing, as well the fact that he assisted Dr.

Flood, (Mar. 2022 Dep. of J. Pungello at 71:11–18.)  Further, Mr. Pungello directly witnessed

that individual "pulling on "[G.A.P.'s] head hard," (Mar. 2022 Dep. of J. Pungello at 79:18–21,

78:19–20; May 2024 Dep. of J. Pungello at 11:18–12:3, 12:8–18), and later that day, described

what he had witnessed to Ms. Pungello, (Mar. 2022 Dep. of C. Pungello at 75:20–76:2, 93:6–24).

Still later that day, another doctor informed them that pulling on an infant's head was a possible

cause of G.A.P.'s Erb's palsy.  (Mar. 2022 Dep of C. Pungello at 99:24–100:13; Mar. 2022 Dep.

of J. Pungello at 89:14–90:22.)  A simple inquiry to Hospital staff, before or after discharge, as

---

[12] The Government asserts that Dr. Flood called out for "Dr. Babalola" by name and that
Dr. Babalola introduced himself when he entered the room.  (*See* Gov't 56.1 ¶ 9; Gov't Mem. 12
n.5.)  Dr. Babalola testified that "yes," he did introduce himself, but then clarified that while it
was his typical practice to introduce himself and show the patients his badge, he did not "recall
this [introduction] specifically."  (June 2024 Dep. of G. Babalola at 39:16–25.)  The Pungellos
both testified that they did not learn his name in the delivery room.  (Mar. 2022 Dep. of C.
Pungello at 76:14–19; Mar. 2022 Dep. of J. Pungello at 70:22–71:5.)  Drawing all reasonable
inferences in Plaintiffs' favor, as the Court must, *Torcivia*, 17 F.4th at 354, the Court may infer
that the Pungellos, at the very least, did not hear Dr. Flood call for Dr. Babalola by name or hear
Dr. Babalola introduce himself.

to who assisted Dr. Flood—and whether that individual was also a doctor—would have revealed the information Plaintiffs ostensibly waited two years to receive from Dr. Flood. This inquiry would plainly have been possible even without knowing Dr. Babalola's name at the time. Yet the record does not indicate any effort on Plaintiffs' part to identify Dr. Babalola while they were in the Hospital or after, and Plaintiffs—and their counsel—offer no explanation for their failure to do so.[13]

This failure is particularly notable considering that Plaintiffs and their counsel had access to Ms. Pungello's medical records, which, in a detailed account of G.A.P.'s birth, name "Dr. Babalola" as being "in room assisting." (MSL Hospital Chart Part 2 at 5.) Plaintiffs make much of the fact that Dr. Babalola's name does not appear in the delivery note or the anesthesia record, but instead, only in a nurse's note "[sixty-seven] pages removed from" those records. (Pls' Opp'n 8–9, 15, 20; MSL Hospital Chart Part 2 at 5.) But regardless of where Dr. Babalola's name appeared in the record, the fact remains that it *did* appear—and that mention of another doctor "assisting" Dr. Flood, coupled with the Pungellos' first-hand knowledge that another individual did, in fact, assist Dr. Flood with G.A.P.'s delivery, is sufficient to put the Pungellos on notice of Dr. Babalola's involvement.

Rather defensively, Plaintiffs' counsel asserts that "[c]ommon sense and reality dictate that it is unreasonable to expect the attorneys to recognize that an individual named in a single nurse's note out of a 337-page record . . . was the elusive delivering physician prior to obtaining Dr. Flood's deposition." (Pls' Opp'n 15.) Common sense dictates no such thing. As the Second

---

[13] Even somehow assuming the Pungellos' counsel was unaware of this unidentified individual's involvement in the birth before the Pungellos sat for their March 2022 depositions— which begs belief—counsel should have, at the very least, attempted to ascertain Dr. Babalola's identity after their clients testified to his involvement at that time.

Circuit noted in *A.Q.C.*, "[i]t is fundamental that a lawyer investigating a possible claim on behalf of a client needs to investigate not only whether a potential claim exists in the abstract, but also who would be the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist." 656 F.3d at 145. Plaintiffs' counsel are experienced medical malpractice attorneys who are no doubt accustomed to reviewing medical records likely more voluminous than the ones in this case. It matters not that Dr. Babalola's name was mentioned only once in Ms. Pungello's medical records when, again, Plaintiffs and their counsel were on notice that there was an unidentified individual, in addition to Dr. Flood, involved in the birth.[14] *See Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002) ("[A] want of diligence by a plaintiff's attorney generally will not prompt a court to provide relief from a limitations period by way of an equitable toll.").

Indeed, in similar contexts, courts have consistently denied tolling where a plaintiff "is unaware that an alleged tortfeasor is a federal employee" when that lack of awareness is "undermined by the readily available information on this subject." *J.D. ex rel. Doe*, 2011 WL 292010, at *10–11; *see also A.Q.C.*, 656 F.3d at 145 (noting that "common sense" and "years of experience in medical malpractice litigation[] would alert a reasonable advocate to the possibility" of the alleged tortfeasor's federal status); *Lassic v. United States*, No. 14-CV-9959, 2015 WL 5472946, at *3 (S.D.N.Y. Sept. 16, 2015) ("lack of knowledge" about a federal employee's status "does not . . . excuse the delay as a matter of law," particularly when publicly available information would have revealed the federal nexus); *Hernandez*, 2017 WL 3328243, at

---

[14] Nor is it any excuse that Dr. Babalola was listed as "assisting" rather than "delivering." (*See* Pls' Opp'n 20.) Plaintiffs point to no authority stating that an obstetric malpractice claim can only be asserted against the delivering physician, or that there can only be *one* delivering physician at a given birth.

*12 (same).  So too here, "no extraordinary obstacle prevented [Plaintiffs and their counsel] from identifying" Dr. Babalola's identity in a timely fashion, particularly given they had ample means and opportunity to ascertain it for themselves.  *A.Q.C.*, 656 F.3d at 145.  Accordingly, they cannot demonstrate that they diligently pursued their federal claims.  *Id.* (concluding that an experienced medical malpractice firm "cannot now argue that it diligently pursued [a] claim" when it "neglected to take [the] simple step" of investigating the appropriate parties to sue); *Bowman v. U.S. Postal Serv.*, No. 02-CV-6138, 2003 WL 1395821, at *4 (S.D.N.Y. Mar. 20, 2003) (denying equitable tolling for a medical malpractice claim even though plaintiff did not have access to his complete records, because "the fact that the medical records [we]re missing did not prevent [plaintiff] from discover[ing] the critical facts of both his injury and its cause" (internal quotation marks omitted)); *accord Blanche v. United States*, 811 F.3d 953, 962 (7th Cir. 2016) (denying equitable tolling where a plaintiff did not file suit until over a year after she had obtained counsel and had all of her medical records, which "indicate[d] that not only did she fail to diligently pursue her claim, but her lawyers did as well").

b.  Extraordinary Circumstances

Moreover, Plaintiffs have not demonstrated any extraordinary circumstance entitling them to equitable tolling.  The gravamen of Plaintiffs' argument is that Dr. Flood and Dr. Babalola intentionally and fraudulently "conceal[ed] the true extent of [Dr. Babalola's] involvement in the infant plaintiff's delivery," (Pls' Opp'n 20), "for the express purpose of shielding Dr. Babalola from liability for claims of malpractice in a litigation later commenced by the plaintiff parents," (*id.* at 9).  The record does not support such an assertion, even resolving any doubts in Plaintiffs' favor.

"Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff proves three elements: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Broccoli v. Ashworth*, No. 21-CV-6931, 2024 WL 1199549, at *6 (S.D.N.Y. Mar. 20, 2024) (internal quotation marks omitted); *see also Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014) (noting that to prove fraudulent concealment, a plaintiff must establish that 'the defendant wrongfully concealed material facts,' which 'prevented plaintiff's discovery of the nature of the claim.'" (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012)). "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004).

As discussed above, Plaintiffs have not demonstrated that they exercised due diligence, which alone dooms their fraudulent concealment argument. *See In re Merrill Lynch Ltd. P'ships Litig.,* 7 F. Supp. 2d 256, 274 (S.D.N.Y. 1997) ("[E]ven when a plaintiff pleads active concealment by the defendant, the plaintiff must still demonstrate that he exercised due diligence in trying to discover the fraud."). But in addition, they have also failed to prove the remaining two elements.

First, Plaintiffs have not shown that Dr. Babalola (and/or Dr. Flood) wrongfully concealed his involvement in G.A.P.'s delivery. Dr. Babalola testified that he did not write a delivery report or otherwise notate his involvement in the existing report (as prepared by Dr. Flood). (June 2022 Dep. of G. Babalola at 52:5–53:25.) He further stated that he did not do so

"[b]ecause Dr. Flood [wa]s expected to write a note about the delivery," (*id.* 53:19–25), as "[t]he

onus is on the primary care physician to write a note and describe what happened, assistant or no

assistant or whatever," (*id.* 55:14–17).  Dr. Flood testified she prepared a delivery note

describing the birth, (July 2022 Dep. of F. Flood at 99:13–15), which is consistent with Dr.

Babalola's testimony that it was her responsibility to do so.  Dr. Flood also testified that she did

not mention Dr. Babalola in the delivery note, and, when asked if there was "any reason" she did

not do so, replied that it was "just an error on [her] part."  (*Id.* at 124:23–125:6.)  On its own, this

testimony does not demonstrate that either doctor intended to fraudulently conceal Dr.

Babalola's involvement, and Plaintiffs offer no support to refute such testimony apart from the

general allegation that the omission "leads to the inescapable conclusion that such an omission

was no mere accident; it was intentional."  (Pls' Opp'n 9.)  Yet apart from conclusory attacks on

Dr. Babalola and Dr. Flood's credibility, Plaintiffs offer no affirmative evidence suggesting that

the doctors (or the Hospital) took affirmative steps to conceal Dr. Babalola's involvement.  This

is insufficient to raise a triable issue of fact.  *183 Bronx Deli Grocery Corp. v. United States*, No.

11-CV-1527, 2012 WL 2359664, at *3 (S.D.N.Y. June 18, 2012) ("The non-movant cannot

avoid summary judgment simply by asserting a metaphysical doubt as to the material facts, and

may not rely on mere conclusory allegations nor speculation, but instead must offer some hard

evidence showing that its version of the events is not wholly fanciful." (emphasis added)

(citations and quotation marks omitted)); *Moritz*, 2017 WL 4785462, at *8 ("[W]hen opposing a

motion for summary judgment, the non-moving party may not respond simply with general

attacks upon the declarant's credibility, but rather must identify affirmative evidence from which

a jury could find that the non-moving party has carried its burden of proof").

In support of their argument, Plaintiffs point to two regulations—New York Education Law § 6530(32) and New York State Medical Records Regulation 10, N.Y.C.R.R. § 450.10[15]— as "proof" that Dr. Babalola had an independent obligation to create a record of his involvement, which he then failed to do.  (Pls' Opp'n 18 n.4, 21–22.)  The Parties dispute whether these regulations even apply to Dr. Babalola or Dr. Flood.  (*See* Gov't Mem. 16–17; Pls' Opp'n 22.)  However, it does not matter whether Dr. Babalola and Dr. Flood are bound by either § 405.10 or New York Education Law § 6530(32).  Even if they are, this proves only that the doctors violated those regulations—*not* that they intentionally did so to conceal Dr. Babalola's involvement in G.A.P.'s birth.  This does not, on its own, demonstrate fraudulent concealment. *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990) ("[E]quitable tolling . . . do[es] not extend to what is at best a garden variety claim of excusable neglect."); *Syfert v. City of Rome*, 768 F. App'x 66, 69 (2d Cir. 2019) ("Conclusory allegations of non-disclosure do not amount to fraudulent concealment or the sort of extraordinary circumstances that warrant equitable tolling." (citing *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157–58 (2d Cir. 1995))); *Nimham-El-Dey v. Health & Hosps.*, No. 21-CV-8238, 2022 WL 158554, at *3 (S.D.N.Y. Jan. 18, 2022) (denying tolling when plaintiff "failed to allege any specific facts" suggesting medical staff "fraudulently concealed anything from him," instead only relying on "conclusory assertions").

Second, even had Plaintiffs demonstrated that Dr. Babalola committed misconduct to conceal his role in G.A.P.'s delivery, they have not shown that this concealment prevented their

---

[15] The Education Law provides that a physician commits professional misconduct if they "[fail] to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient. . . ."  N.Y. Educ. L. § 6530(32).  Section 405.10 provides that all hospitals maintain "accurate, clear, and comprehensive medical record[s] . . . for every person evaluated or treated as an inpatient, ambulatory patient, emergency patient or outpatient of the hospital."  New York State Medical Records Regulation 10, N.Y. Comp. Codes R. & Regs. tit. 10, § 405.10.

discovery of the nature of the claims within the limitations period. *Harper*, 648 F.3d at 137;

*Broccoli*, 2024 WL 1199549, at *6. As discussed above, Plaintiffs had ample notice of both Dr.

Babalola's involvement in the birth and that the medical treatment he provided was a potential

cause of G.A.P.'s injury. (*See* Supra II.B.1.) Even had Dr. Babalola and Dr. Flood conspired to

conceal Dr. Babalola's role, Plaintiffs could have easily ascertained his identity had they merely

asked the Hospital who he was at any point during the two years following G.A.P.'s birth, or

diligently reviewed Ms. Pungello's medical records and investigated who was the "Dr. Babalola

in room assisting." (MSL Hospital Chart Part 2 at 5.) Accordingly, because Plaintiffs could

have discovered Dr. Babalola's identity on their own, Plaintiffs "fail to articulate acts by

defendant that prevented [them] from timely commencing suit" and thus cannot equitably toll

their claims.[16] *Marshall*, 51 F. Supp. 3d at 464 (internal quotation marks omitted); *see also*

*Koch*, 699 F.3d at 157 (denying equitable tolling where plaintiff was able to obtain the necessary

knowledge about his claim "by simply making a phone call" and there was "no allegation that

any defendant took any action that prevented [plaintiff] from making the same phone call"); *De*

*Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 424 (S.D.N.Y. 2015) (finding fraud claims

untimely where plaintiff alleged an art gallery did not disclose an FBI investigation and

---

[16] The single case Plaintiffs cites in support—*Holmberg v. Armbrecht*, 327 U.S. 392 (1946)—does not change the outcome. In *Holmberg*, the Supreme Court considered the dismissal on statute of limitations grounds of a lawsuit brought by various creditors to enforce the liability imposed against shareholders of a defaulting bank. *Id.* at 393. In the Supreme Court, the creditors argued that one shareholder's deliberate concealment of his stock ownership prevented them from timely filing. *Id.* The Supreme Court reversed, holding that a statute of limitations does not begin to run "until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party," and remanded for further proceedings. *Id.* at 397 (internal quotation marks omitted). But as *Holmberg* makes clear, this applies only "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." *Id.* Here, as already extensively discussed, the undisputed evidence establishes Plaintiffs' insufficient care and diligence such that equitable tolling is inapplicable.

"instructed its employees not to disclose information about art works [the gallery] sold," because "mere silence or failure to disclose wrongdoing is insufficient . . . to justify equitable tolling").

The Court has no doubt that this has been a fraught and heartbreaking ordeal for Plaintiffs and is sympathetic to what they have had to endure. "[B]ut the Court is not free to ignore the law to account for the emotional nature of this Action." *Hernandez*, 2017 WL 3328243, at *13. Equitable tolling is reserved for plaintiffs who show reasonable diligence in the face of extraordinary circumstances—neither element is present here. Accordingly, Plaintiffs have not demonstrated there is a triable issue of fact or law as to the timeliness of their claims and, therefore, cannot avoid summary judgment.

### III. Conclusion

For the foregoing reasons, the Government's Motion for Summary Judgment is granted. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 20), enter judgment for Defendant, and close this case.

SO ORDERED.

Dated:    December 9, 2024
      White Plains, New York

_____
      KENNETH M. KARAS
      United States District Judge